is 2015-2021 Endo v. Teva. Mr. O'Quinn, please proceed. Thank you, Judge Warren. May it please the court, John O'Quinn on behalf of the defendants. The district court's decisions on both written description and obviousness cannot be sustained because each depends on a misunderstanding or misapplication of this court's precedents. Starting with written description, the district court reasoned backwards that inventors must be allowed to claim broadly because, quote, had the claims been more restrictively drawn, they would have invited infringement, end quote. That's Appendix 128. But it is simply not the law that an inventor can claim a zone of protection that is broader than what he actually invented, and that alone requires a remand here. Thank you. Mr. O'Quinn, in this case, of course, you bear the burden here of establishing invalidity on each of the grounds asserted. And when I looked at the record, I saw that you had testimony that the range was too broad. The other side had testimony that the range was suitable. But other than an assertion from Dr. Kibbe that the range was too broad, what did you have by way of evidences to show either, A, what would have been broad enough but not too broad, or B, why this range was too broad? Sure, Judge Bryson. Well, I think that the most critical evidence here is by his own admission, the inventor who was responsible for efficacy, Dr. Lee, testified that he had, quote, no idea, end quote, whether compositions throughout the claimed ranges would be efficacious for 12 He said it would just be a guess. And he admitted that he didn't come up with the claimed ranges. He pointed to Dr. Cowell. Dr. Cowell said he didn't remember whether he had come up with the claimed ranges. It was possible that he did. But he asserted that he thought they were suitable. Well, and your witness testified that they weren't suitable. But no one, so far as I can see, said here's, obviously, they weren't limited to exactly 28 to 33 or 32.8 or whatever it was. So there was some room, presumably, around in the curtilage for there to be an extra range. What evidence do you have that this would have been a permissible range, some smaller range, but that the range that was claimed was too much? Other than, I grant you Dr. Lee was confused, but Dr. Cowell came in and said that we thought this was suitable. Well, respectfully, Judge Bryson, I don't think that Judge Cowell provided any basis for that other than his own conclusion. You're right, but he did assert it to be the case. He did assert it. And, of course, the question here, as Ariadne and Novozymes teach, is whether a person of ordinary skill in the art, looking at the four corners of the specification, would know that the inventors possessed the full range. And when you have Dr. Lee, who is the inventor responsible for efficacy, telling you that he can't say whether a given formulation that would meet the dissolution limitations, for example, would have the requisite efficacy, I think that that is telling evidence that they did not have possession over the full range. I think you also, Judge Bryson, have the situation here where we're not claiming that a patent owner must test all formulations across a claimed range in the normal course, but ENDO was caught between a rock and a hard place. They had an on-sale bar problem in addition to their written description problem. And to avoid the on-sale bar, ENDO had to argue that unpredictability and complexity made it such that the invention was not ready for patenting until they had the final, not preliminary, but final results from human clinical testing. And they also argued, in response to obviousness, that, quote, oxymorphone had unique properties and profile had to be specifically, quote, tailored. And that's in their red brief at pages 43 and 44. And our simple argument is that if it's a situation where the complexity of the art, that's obviously a factor under ARIAD at page 1351, if the complexity of the art is such that you can't know, it can't be ready for patenting until you've completed human clinical trials and not just gotten preliminary results that show it would be efficacious across the And if the art is so unpredictable that you can't know which of the formulations are going to work until they are tested, and that's the arguments that they make at pages 43 to 45 of their red brief in response to obviousness, that it's not reasonable for a person of ordinary skill in the art to assume that they have possession of the claimed range, particularly when the inventor is With the specification in hand, I don't know. And Dr. Cowell, with the specification in hand, can give no reason why a person of skill in the art would make the extrapolations that he says are reasonable. So I think when you add all of that together, Judge Bryson, given the state of the art, given the arguments that were made here, and given the fundamental error, legal error, that the district court made, it requires at least a remand, if not a outright reversal. I mean, to be clear, even if you want to say, well, there is a battle of evidence or a battle of experts to be had here, that battle is nowhere to be found in the operative pages of the district court's opinion. His opinion consists of three paragraphs and analyzing written description. And his analysis on page appendix 128 turns on the idea that if the claims had been more restrictively drawn, they would have invited infringement. That's not the test for written description. So even if you want to say that the evidence is a toss-up and that the district court could have reasonably come to a conclusion in favor of Endo, and I don't think that's the case, the district court didn't do that analysis, and that at a minimum requires a remand. Now, if the court has further questions on written description, I'm happy to take those. Otherwise, I'm also happy to turn to the issue of obviousness. So with respect to obviousness, your honors, this court in Enrique Cal already found that the, quote, administration of controlled release oxymorphone is squarely presented in the prior art. With all due respect, this court doesn't find anything, do we? The court, Judge Moore, to be precise, the court affirmed and found that there was substantial evidence. We held that there was substantial evidence. The court observed, and this is 1071 of its opinion, it is undisputed that Maloney discloses a method of providing extended pain relief by provision of a therapeutically effective amount. But I understand that this court is not in the fact-finding business, of course. And my argument is not... And in that case, it was undisputed. In this case, it is disputed. There's a different standard of review and a different fact-finder, correct? That's absolutely right, Judge Moore, and I am not arguing that this court's decision in Enrique Cal is binding on the district court here. Our argument is that the district court made a number of legal errors, and it is telling that the district court did not even acknowledge, did not even address this decision in Enrique Cal. And if it had, it may not have made the legal errors that it did. Well, that leads into my questions. What role do you think that Cal plays in this case? I mean, it is a different standard, and yet your briefs suggest that there's a legal error on the part of the district court in not addressing Cal. What should the district court have said that was the proper role for Cal to play in this case? Well, Judge Bryce, I think at a minimum, given that this is an opinion by a district court on the legal issue of obviousness, and the legal issue of obviousness was before this court previously in Enrique Cal, it certainly would have been a useful check for the district court to have considered, to have looked at, to have acknowledged that this court had addressed the legal issue. Well, a useful check. It would have been a useful check. Let me put it this way. Suppose the district court had said exactly what Judge Moore just said about Cal, and then stopped, and then said, for that reason, Cal has no effect on this proceeding. Would you think that would satisfy your sense that the district court should have at least addressed Cal? Well, I think that would have shown that it at least acknowledged that it exists. And let me be clear. I'm not arguing that it erred as a matter of law because it didn't talk about this court's opinion in Cal. I'm not saying that it had to. But it did err as a matter of law in a number of ways. It rejected prior art references like Maloney, which was before this court in Cal, and Oshlak on the theory that they included oxymorphone on a long list of compounds. That's wrong on the facts, and it's inconsistent with Merck versus Biocraft. It rejected prior art references like Penwest because they were not technical documents. That's contrary to KSR. Penwest is the S-1? The S-1. That's right, Your Honor. It required interchangeability between oxymorphone and other active ingredient opioids rather than just a reasonable expectation of success. That's contrary to Bayer versus Barr. And it required that the prior art expressly disclose inherent properties or that there be evidence that those inherent properties were known in the prior art. That's contrary to Abbott versus Baxter or Santeros or Kubin and Parr. And if the district court had looked at this court's opinion in recal and addressed it, there's a good chance it would not have made those legal errors. But those legal errors permeate the opinion. And for that reason alone, claim one of the 216 patents, which had no dissolution limitations, and which in that sense is indistinguishable from the kinds of claims that this court affirmed were not patentable in recal, for that reason alone, claim one should be reversed if not at a minimum remanded. What would be the effect on the judgment in this case if claim one were reversed? If the judgment on claim one were reversed? So Judge Bryson, if the judgment were to reverse with respect to claim one and only claim one, I don't know that that would have any practical effect in the context of this case. Obviously some of the defendants have argued that the written description arguments apply to all of the claims, including claim one. Activists had argued that the written description argument applied to all the claims except for claim one. And so with respect to activists' arguments, if the court were to agree on written description and were to agree that claim one was obvious, then that would have a very significant effect because it would render all of the claims invalid. Now that leaves the dissolution limitations. And with respect to those, I do recognize that that issue, albeit in different postures on different records, have been before this court twice before. But to that end, the appeal does involve references that have not been before this court before, and references that the district court largely ignored. And those are, first and foremost, the Madden reference. Madden teaches dissolution ranges for the basket method at 100 RPM, which was used in the Maloney and Oshlak references, were indistinguishable from the paddle method at 50 RPM, which is of course what the claims require, with respect to highly soluble drugs like the one at issue. And this is Appendix 6429, quote, hydrodynamics had no effect on the release of a highly soluble drug from a hydrophilic matrix system. And that means it doesn't matter what apparatus you used or what speed it was working at. And Endo's own submissions to the FDA confirmed, in order to get its crush-resistant formulation approved, it confirmed what Madden predicts, that oxymorphone was insensitive to hydrodynamics. And you can see that- You're into your rebuttal time. Can I ask you just to spend about 30 seconds and talk about the appeal of the injunction, please? Yes, so with respect, there are two issues relating to the injunction, and as it applies specifically to activists. One is with the 271A through C analysis and whether or not the eBay factors were satisfied. For the reasons submitted in our brief, we submit that they were not. If the court disagrees, I think that then makes the issues with respect to 271E moot. We do think the district court got the 271E issue correct as a matter of statutory interpretation. The court has no further questions. I'll reserve the balance of my time for rebuttal. Okay, thank you very much. Mr. Black. May it please the court. Both written description and obviousness turn on questions of fact. And the findings of the district court after a five-week trial cannot be overturned unless they are clearly erroneous. What do the appellants offer in support of their burden below, of clear and convincing evidence, and on appeal, that the factual findings of the district court were clearly erroneous? Very little. On obviousness, the district court reached the same result as the patent trial and appeal board, that the claims of the 216 were non-obviousness in the face of the principal prior art relied upon at trial, Maloney and Ashlak. The court affirmed the PTAB decision and should do the same thing here. There's been no assertion made on appeal. Was Ashlak before the PTOI or was it just Maloney? Ashlak was before. Because I remember the Cow case itself. That's correct, Your Honor. It was only involved Maloney? Yes, Cow. So when it went back, Ashlak appeared? Yes, that's correct. Cow involved Maloney and the issue there, in every obviousness case, the first thing you need to do is identify the prior art, identify the combination of prior art that the challenger believes in combination would teach the claim, and then show why there would be a reasonable expectation of not that many obviousness cases turn on what does the prior art teach. Usually you can find the elements in the prior art, the question that's mostly about the combination. This case, founded on the first step, which is what does the prior art teach? And in a red KO, the court said, well, patent office, you cannot assume that the paddle and the basket methods aren't the same without evidence, and the patent office eventually issued the claim. The same issue played out at the PTAB, albeit with experts, with a trial of the PTAB and all of the due process that's involved there, and our trial at district court, where of course the standard was clear and convincing evidence, we had days and days of testimony on this issue of the correspondence between the paddle and the basket and the paddle at different speeds, and the judge made factual findings which are well supported. They were not clearly erroneous. The written description case, Your Honor, we had more argument today from counsel for the appeal on written description than we did at the arguments at the trial. We had a five-week trial which was mostly about obviousness. They submitted evidence from Dr. Kibbe, but when they closed the case, there was only six pages of the transcript in their closing where they addressed written description. Dr. Kibbe was not credible. They did not rely on his testimony, and they made the argument they made here that they were basing their case on the statement of Dr. Lee. Dr. Lee was one of the inventors. He'd been out of the business for a long time. He was not working for Endo at the time, and most importantly, he's an M.D. who was involved in running clinical studies. He takes care of patients. The people who make the decision about how wide that range can be around a drug that's been proved to be effective, what the reasonable range is, those are pharmacokineticists. But we don't seem to have any, well, there are two problems that I see that I'd like to address. The first is we don't seem to have any evidence going to why the range was reasonable other than the assertion of Dr. Kibbe that it was. No, Your Honor, we have much evidence. We presented, first of all, of course, it's not our burden. I understand that, but I'm interested in what evidence you did have because that's all I saw was Dr. Kibbe. We had Dr. Fasigi who was an expert in pharmacokinetics. He testified that formulators make these judgments all the time. He testified that he reviewed the ranges in the patent and the data that was available, and in his opinion, they were reasonable. He testified that generics use this process in order to run the entire generics industry. But that all sounds ipsy-dixit to me. I mean, he says they're reasonable because I'm an expert in this field and I think it's reasonable. Is that the case? No, Your Honor. He relied on the ranges that the FDA permits generics to use to establish bioequivalence. That was part of his testimony. Now, what happens in the industry is that once somebody like Endo goes along and spends $100 million taking a path that no one else traveled and develops a drug and proves that it works, you have two things. You have a dissolution profile that's an in vitro, in the lab test that can be done to determine what the dissolution rate is, and you have a pharmacokinetic data on blood levels. And what the generics do, what they say is they don't have to do a clinical trial to prove efficacy, right? They take a pill, they dissolve it, they get the dissolution profile, they file with the FDA saying that they're within a particular range and their mathematical constructs for determining how close is close enough. But those ranges tend to be pretty small, if my recollection is that, don't they? I mean, I think 5 or 10 percent is the typical. No, Your Honor. It's not typical. The evidence in the case was undisputed that the range that Endo used in the case was the same range that the generics have used to make their drugs. In fact, we charted, we took the ranges and we charted all of the generics' dissolution profiles and they filled the entire range and didn't go beyond the range that Endo had claimed. That was the so-called rainbow chart which was produced at the District Court. We also had evidence from Dr. Fasighi on what the ranges were that are used by the FDA and how the industry works. He also looked at other patents in the field to see what people think is reasonable as far as making claims with respect to ranges and he concluded that our range was reasonable. In fact, it was much narrower than in Oshlak or some of the other cases. So there was substantial evidence at the trial about the reasonableness of the ranges, even though it was not our burden. Okay. My second question is you don't defend, do you, the District Court's avoidance of infringement rationale for rejecting the written description? I think they're over-reading that and that's not what the District Court was saying. We made the argument from a policy perspective, you can't be limited just to the exact line of the dissolution profile and the defendants ultimately admitted yes, you're entitled to a reasonable range. Right. And we said we're entitled to a reasonable range and that's because you can possess the invention and you can claim it and it's important that you the inventor get to claim the full scope of his or her invention. And that's what we were talking about and that's what I believe the District Judge was referring to. But again, I want to stress that the written description point made here and the way they've argued it, they all but abandoned the argument at trial. There was only six pages of argument and a full day of closings on written description. Now on appeal, it's been elevated into a significant issue. But in their brief, where they're trying to demonstrate that the District Court was clearly erroneous, all they rely on is Dr. Lee's testimony, who was not a qualified expert in the area, we had another inventor who was an expert and we had Dr. Fasihi's testimony. So it is clearly not erroneous for the District Court to have concluded that they failed to meet their burden. Could I ask a question about the pharmacokinetic limitations? Yes, sir. The argument is made that those are inherent and therefore do not add anything of patentable significance. Could you address that? Certainly, Your Honor. It goes back to the first point. When you're proving an obviousness case, you have to establish that the elements are in the prior art and then we go to the next question, combination. So they needed to deal with the problem that there are a lot of pharmacokinetic limitations, including fed and fasted data, which meant that when you gave the more than a 20% difference between fed and fasted, which is highly desirable because it means you don't have to give the kind of food warnings that you might need with some drugs where you say you must take this with food, etc. So they needed to establish that the food effect, for instance, was inherent in all formulations. Otherwise, they have a problem. But they didn't present any evidence on that point. In fact, their expert, Dr. Elmquist, admitted that that element was not inherent. It goes to how you build an obviousness case. You identify the claim. Then you say, here are the elements. Here are why the elements would be combined. You look at secondary considerations. They failed at the first step on obviousness. They failed to demonstrate that these elements were in the prior art. And it's similar to what happened at the PTAB, which held that the multiple peaks were not inherent. And that was after expert testimony from one of the experts in our case for the defense. And obviously, the standard is more difficult to reach for a challenger in the district court. So I want to address briefly the cross-appeal. Before you go into the cross-appeal, I'd like you to address the injunction issue. And in particular, I'd like you to focus on the district court's suggestion that ENDO lost 11% of its market share to Actavis alone. I am struggling to find the substantial evidence to support a conclusion that Actavis' 11% market share would have inured entirely to ENDO, as opposed to largely to impacts, as opposed to ENDO. So I'd like you to address the issue. But in particular, maybe your co-counsel at the table could find the evidence that I'm going to ask you to present to me that supports that view. In particular, in the case that supports this finding by the district court. So you want to start with the argument and get him started on finding the evidence? Yes, Your Honor. So we have a situation here which is a little bit unusual. We have a we have a branded product, and then we have a generic entrant, and then we have a second generic entrant. And the question is, does the second generic entrant damage the branded company? Or does the generic? And at trial, unless I'm mistaken, most of the testimony and evidence actually went to whether additional generics like Roxanne, not even just impacts and Actavis, but whether the permission of additional entrants into the generic market would harm ENDO. That's what I read in terms of the expert discussion. Most of his testimony, it seemed to me, went to not just Actavis, but whether or not Roxanne or others should be allowed into the market and what effect they would have for ENDO on the market. Is that right? Is that what was going on at the time? At the time of the trial, of course, Actavis had launched. So the testimony was about what would happen if you had generics on the market. If you were one, two, three, they all harm the branded company. They had a theory that all of their sales were coming from impacts. There was no support for that whatsoever. We submitted evidence from Dr. Bell. Okay, why don't you direct me right to that. In the 36,627. What volume of the appendix are you looking at? That is in volume. Three. Four. Oh, four. 36. Oh, 36,000. 36,000. 36,627. That's a long trial. Hold on. Give me a sec. I'll give you a minute to address your cross appeal. Don't worry about that. 36,000 what? 627. Okay, what is this document you're directing me to? This is the... This is the one with the yellow pages, right? This is the yellow pages. This doesn't look like testimony. It's a declaration of Brian Lordy submitted in the post-trial. And 36,627 to 36,630 addresses these issues as well as some of Dr. Lordy's, not Dr. Lordy, Mr. Lordy's testimony at trial relating to the inability to promote... Yeah, but the header, unless I'm mistaken, says if multiple generics are allowed on the market, the drastic price erosion will be permanent. So this... No, no, but we had multiple generics on. The question that was being addressed at the district court was whether or not all these generics should be barred. Okay, show me where in here... The district court has found that ENDO would have gotten the entire 11% of Medicaid that's lost. That's what the district court expressly found. Where is the support for that fact finding? Show me precisely what sentence in this expert declaration supports the idea that ENDO lost 11%. The entire Actavis market would have inured to ENDO. I'm unable to do that right now, Your Honor. Well, I posit you're unable to do it because it doesn't exist in the record. Where is it? The testimony on this came from Mr. Bell at trial and this statement. If you feel that's inadequate to support the finding of the district court... Well, show me what in the statement does it. I'll give you extra time. Stand there and read it. Okay. I'm unable to find it, Your Honor. Your Honor's read this more recently and perhaps more carefully than I have recently. So the question, though, our preliminary injunction finding, though, did not rest entirely... Look, I'm sensitive to the idea that this is a big case with a lot of issues and you're dealing with a shotgun-style appeal and cross-appeal. Right. You added to the mess, so you're not immune from it. Let me put it this way... I don't see evidence that supports this conclusion by the district court, which is critical to the injunction. The injunction requires irreparable harm. The irreparable harm he found, it seems, is the lost sales. And I'm having trouble finding support for the idea that ENDO lost the sales that Actavis made as opposed to impacts. Your Honor, one of the difficulties in the case from... Injunctive relief is designed to prevent irreparable harm. It's difficult to compensate with monetary damages. Whenever you have competition, and we have competition here, there is going to be some lost sales to ENDO. There may also be lost sales to impacts. The question is, if you can't determine where the sales are coming from definitively, but it's highly likely, in the circumstance, that some of the sales were coming from ENDO, and that if they stayed on the market... But where is the evidence that says that? Because you've got two generics, one of which is a licensed generic, and those two are substitutable for each other. You've got a competitive product in the brand, which is not substitutable for the two generics, or vice versa. They're substitutable, but they're not automatically... Only at the prescription level. They're not automatically substitutable, but they are substitutable. And we had testimony from Mr. Lordy... But you're the one asking for the injunction, so you have to show the irreparable harm. So where is the irreparable harm? Where is the proof that ENDO lost sales? Mr. Lordy testified to it at trial that the generics on the market, which were both a combination of products like Activist and the CRF product, that those would cause harm to ENDO through loss of ability to promote products. That's at appendix 36630. Loss of ability to conduct R&D, 36630. Market share, there was testimony about irreparable harm at the appendix at 1243, 1262 to 64, 71 to 72, 75 to 77. So I'm on several of the pages that you cited, and I see nothing that supports what you're claiming. So how about this? Is close of business tomorrow unreasonable? Submit to me two pages... Certainly, Your Honor, we can do that. Along with specific sites to whatever it is that you say... Do you have any objection to me requesting this? Two pages, singles-based, letter brief, with sites to the pages in the JA, which you believe demonstrate substantial evidence for the district court's fact findings related to irreparable harm. And in particular, you understand that what I'm asking you to justify is where is the proof that he could have relied on for his conclusion that, quote, specifically ENDO lost 11% of its market share to Actavis alone. Okay. That's his fact finding, and I find that to be bewitching. I understand, Your Honor. We will address that. I would also point out that even if that fact went away, that even if there was 1% of the sales or some percent of the sales, that would still be irreparable harm. Because how are we to calculate? How are we to know what it is? And how are we to know what it's going to be three years from now if they had stayed on the market with continued erosion of our product? The fact that we can't identify with absolute precision exactly where the sales came from supports a finding of irreparable harm because we can't compensate it with money damages because we don't know exactly what it is. Let me just address our cross-appeal, which becomes relevant if the injunction goes away. So there's, in this case, 271E4, of course, provides for mandatory injunctions in the case of a defendant which infringes under the Hatch-Waxman regime. In this case, some of the defendants, the patents that issue were issued after the applications had been filed but before they had been completed. Activists says that their application was approved. Can I ask you a quick question? You said this issue becomes relevant if we take away the injunction. I thought we had to reach the 271E2 issue either way, no matter how we resolved the appeal. Are you suggesting that the 271E2 issue, in particular the statutory interpretation of the submission language, is that only something this court reaches if we don't otherwise affirm the case? I think that's right, Your Honor. Under 271A, the judge found that we were entitled to injunctive relief. The injunction that we would get under 271E would be co-extensive, I think, with the 271A injunction. So it's only if the 271A injunction goes away that we then have to face the issue of whether or not there's automatic right to injunctive relief under the Hatch-Waxman Act. And that's why we filed the cross-appeal. Okay, so your appeal is sort of a conditional cross-appeal? Yes, Your Honor. Okay, perfect. Yes, Your Honor. Now, I'm way past my time. I don't want to... Okay, why don't you sit down and we'll hear from Mr. O'Quinn, and if he touches upon your cross-appeal, we'll give you a little time. Thank you, Judge Moore. Judge Bryson, to come back to one of the first questions that you asked, there were a number of references that were at issue here that were not in the IPR, including the combination of Webster and Penwest, which was addressed by Dr. Kibitz. Mr. Black suggested that we're raising the profile of the written description argument on appeal. I don't think that's a fair characterization. First, we specifically asked to brief the written description issue to the district court, because frankly, the district court seemed confused at trial, and I think that confusion is reflected in the opinion. The district court denied the opportunity for that briefing. The district court had no post-trial briefing at all, despite us requesting it. So I don't think that characterization is fair, and I think if you look at the transcript excerpts that we've provided, you see that the written description issue was certainly vetted with the district court. We've heard a lot about Dr. Fasihi's opinions today. Again, the district court doesn't mention those at all in his opinion. And also, none of what Dr. Fasihi says goes to anything in the specification on why this extrapolation is reasonable. His opinion is essentially just the general proposition that scientists can extrapolate. But again, you have them making arguments about the unique properties of oxymorphone, the need to specifically tailor oxymorphone's dissolution profile, and that's the red brief, pages 43 to 45. Given all that, I don't see how they can rely on Dr. Fasihi's generic statements. With regard to pharmacokinetics, the multiple peaks point is inconsistent with what they argued in NRECAL. At page 1069, you see this court actually reversing on secondary considerations, because they argued that multiple peaks were inherent to the entire range. And of course, in Santaris, this court held that an obvious formulation cannot become non-obvious by administering the patent and claiming the result. Finally, with respect to the issue of the injunction, as the court has observed, we don't think that they presented evidence to show that there was irreparable harm. The fact that you have a licensed generic on the market, and it's the licensed generic that would be automatically substitutable, not their product, cuts against the notion that there is irreparable harm, and the court should, at a minimum, reverse with respect to the injunction. The court, without going into detail, though, also said they would lose goodwill. He named other stuff, which could stand alone and justify an irreparable harm conclusion, even if the evidence doesn't justify the lost sales in particular. What about that? Well, Judge Moore, again, I think that there's a lot of conclusory assertions about irreparable harm that the district court's opinion would make, and I think that even with respect to those, it's very difficult to reconcile that with the evidence of record, and particularly the fact that you had a generic that was already on the market. Any sort of harm to goodwill, because there's somebody else who's already out there marketing a competing product already exists, I think is belied by the posture that this case arises in. This is the unique case where you don't have the situation where you have a brand and generics are looking to enter the market. You have a licensed generic and there was no A-B substitutability unless it was done specifically at the prescription level. Okay, thank you, Mr. O'Quinn. Thank you, Judge Moore.